**PHH**

**MORTGAGE**

PHH Mortgage Services
1 Mortgage Way
Mt. Laurel NJ 08054

Tel 877-688-7116
Fax 856-917-8003

# **IMPORTANT NOTICE**

Upon written request, PHH Mortgage Services will provide the following information regarding the subject loan:

* A copy of the payment history through the date the account was last less than 60 days past due.
* A copy of the note.
* If foreclosure has been commenced or a POC has been filed, copies of any assignments of mortgage or dead of trust required to demonstrate the right to foreclose on the borrower's note under applicable state laws.
* The name of the investor that holds the loan.

Requests for this information/documentation can be sent to us at the following address:

PHH Mortgage Services
Mailstop SBRP
PO Box 5469
Mt. Laurel, NJ 08054

This notice is being provided for informational and compliance purposes only. It is not an attempt to collect a debt.

Case number: 19-11952-BFK

Debtor: Suhagi Dave and Vashishtha Dave

## **Basis for asserting that "DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee for INDYMAC IMSC MORTGAGE LOAN TRUST 2007-AR1, MORTGAGE PASS-THROUGH CERTIFICATES Series 2007-AR1" has the right to foreclose**

PHH Mortgage Corporation services the underlying mortgage loan and note for the property referenced in this Motion for:

**DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee for INDYMAC IMSC MORTGAGE LOAN TRUST 2007-AR1, MORTGAGE PASS-THROUGH CERTIFICATES Series 2007-AR1**

(hereinafter, "noteholder") and is entitled to proceed accordingly. Should the Automatic Stay be lifted and/or set aside by Order of this Court or if this case is dismissed or if the Debtor obtains a discharge and a foreclosure action is commenced or recommenced, said foreclosure action will be conducted in the name of the noteholder. The noteholder has the right to foreclose because (check the applicable below):

\_\_\_ Noteholder is the owner of the note.

 X  Noteholder is the original mortgagee or beneficiary or assignee of the security instrument for the referenced loan. Noteholder directly or through an agent has possession of the promissory note and the promissory note is either made payable to Noteholder or has been duly endorsed.

\_\_\_ Noteholder is the original mortgagee or beneficiary or assignee of the security instrument for the referenced loan. Noteholder directly or through an agent, has possession of the promissory note and will enforce the promissory note as transferee in possession.

\_\_\_ Noteholder is the original mortgagee or beneficiary or assignee of the security instrument for the referenced loan. Noteholder is unable to find the promissory note and will seek to prove the promissory note through the filing of a lost note affidavit.

\_\_\_ Noteholder is the successor trustee and transferee in possession of the security instrument for the referenced loan.

Instr 200703150032076  Pg 1 OF 25
Prince William County  VA
03/15/2007 2 16 25PM
David C Mable, Clerk

This instrument prepared by:  JUST MORTGAGE INC., 708 CORPORATE CENTER
DRIVE, POMONA, CA 91768
After Recording Return To:
JUST MORTGAGE, INC.
708 CORPORATE CENTER DRIVE
POMONA, CALIFORNIA 91768
Loan Number [REDACTED]

Tax Map Reference No.:

PIN: [REDACTED]

# REFINANCE

———————————— [Space Above This Line For Recording Data] ————————————

## DEED OF TRUST

MIN: [REDACTED]

The following information, as further defined below, is provided in accordance with Virginia law:

This Deed of Trust is given by  SUHAGI DAVE

as Borrower (trustor), to  ~~EXCELENTE SETTLEMENTS~~  Edgard Martinez

as Trustee, for the benefit of Mortgage Electronic Registration Systems, Inc., as beneficiary.

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)   "Security Instrument" means this document, which is dated  MARCH 12, 2007           , together with all Riders to this document.
(B)   "Borrower" is  SUHAGI DAVE

Borrower is the trustor under this Security Instrument.
(C)   "Lender" is  JUST MORTGAGE, INC.

Lender is a  A CALIFORNIA CORPORATION                                    organized
and existing under the laws of   CALIFORNIA                        .
Lender's address is  708 CORPORATE CENTER DRIVE, POMONA, CALIFORNIA 91768

(D) "Trustee" is ~~EXCELENTE SETTLEMENTS~~ Edgard Martinez

Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered corporation whose principal office is located in Virginia. Trustee's address is ~~401 N. WASHINGTON STREET 4TH FLOOR, ROCKVILLE, MARYLAND 20850~~ 6148 Michener Dr, Haymarket, VA 20169

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated MARCH 12, 2007 .
The Note states that Borrower owes Lender TWO HUNDRED FOUR THOUSAND FIVE HUNDRED AND 00/100 Dollars (U.S. $ 204,500.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than APRIL 1, 2037 .

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | | |
|---|---|---|---|
| ☒ | Adjustable Rate Rider | ☒ | Planned Unit Development Rider |
| ☐ | Balloon Rider | ☐ | Biweekly Payment Rider |
| ☒ | 1-4 Family Rider | ☐ | Second Home Rider |
| ☐ | Condominium Rider | ☐ | Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" mean those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

SD

**(Q)** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)** "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

COUNTY                          of                PRINCE WILLIAM                     :
[Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: ▓▓▓▓▓▓▓▓▓▓

## See Exhibit "A"

which currently has the address of                    3075 TECUMSEH COURT
                                                                    [Street]

WOODBRIDGE                          , Virginia        22192          ("Property Address"):
[City]                                                  [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver,

Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.  Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds.  Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments.  If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.    **Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.    **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards

---

including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.    Occupancy.**  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7.    Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property.  Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property.  Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.    Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.    Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.  Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease.  Borrower shall not, without the express written consent of Lender, alter or amend the ground lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.    Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.  If, for any reason, the

SD

Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a)  **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b)  **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11.  **Assignment of Miscellaneous Proceeds; Forfeiture.**  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or



Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value.  Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.  "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12.  Borrower Not Released; Forbearance By Lender Not a Waiver.**  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower.  Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower.  Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.**  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several.  However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

---



Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances:

---



gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall give to Borrower, the owner of the Property, and all other persons, notice of sale as required by Applicable Law. Trustee shall give public notice of sale by advertising, in accordance with Applicable Law, once a week for two successive weeks in a newspaper having general circulation in the county or city in which any part of the Property is located, and by such additional or any different form of advertisement the Trustee deems advisable. Trustee may sell the Property on the eighth day after the first advertisement or any day thereafter, but not later than 30 days following the last advertisement. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by advertising in accordance with Applicable Law. Lender or its designee may purchase the Property at any sale.

---



Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to discharge the expenses of executing the trust, including a reasonable commission to Trustee; (b) to discharge all taxes, levies, and assessment, with costs and interest if these costs have priority over the lien of this Security Instrument, including the due pro rata thereof for the current year; (c) to discharge in the order of their priority, if any, the remaining debts and obligations secured by this Security Instrument, and any liens of record inferior to this Security Instrument under which sale is made, with lawful interest; and, (d) the residue of the proceeds shall be paid to Borrower or Borrower's assigns. Trustee shall not be required to take possession of the Property prior to the sale thereof or to deliver possession of the Property to the purchaser at the sale.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.



**NOTICE:** THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)              _____ (Seal)
SUHAGI DAVE                 -Borrower                                              -Borrower


_____ (Seal)              _____ (Seal)
                                   -Borrower                                              -Borrower


_____ (Seal)              _____ (Seal)
                                   -Borrower                                              -Borrower


Witness:                                        Witness:

_____                     _____

———————————————— [Space Below This Line For Acknowledgment] ————————————————

State of ~~Virginia~~ *Maryland*

County of ~~PRINCE WILLIAM~~ *Montgomery*

The foregoing instrument was acknowledged before me this ___ *3/12/07* _____

by __ SUHAGI DAVE _____

_____

_____

He/She/They is/are personally known to me or has/have produced ___ *Driver's License* ___

_____

as identification.

*[signature]*

Signature of Person Taking Acknowledgement

_____
Title or Rank

PHILIP H. NEFF
NOTARY PUBLIC STATE OF MARYLAND
COUNTY OF MONTGOMERY
My Commission Expires March 1, 2010

_____
Serial Number, if any

My commission expires the _____ day of

_____ .

(Seal)

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3047 1/01  (02/01/07)                    Page 15 of 15                    DocMagic *eForms* 800-649-1362
www.docmagic.com

Case No.: ███████

# Exhibit "A"

Lot Sixty-One "A" (61-A), as the same is shown on a plat entitled Resubdivision Plat Section Eleven "E" (11-E), LAKERIDGE, as the same is duly dedicated, platted and recorded in Deed Book 948 at Page 683, among the Land Records of Prince William County, Virginia.

Being the same property as described in that Deed dated August 29, 2000, and recorded in the Clerk's Office of the Circuit Court of the Prince William County, Virginia, in Deed Book 2948, Page 1388, which was granted and conveyed by Household Bank, FSB unto Suhagi Dave.

Tax Identification No.: ███████

HAVING a street address of: 3075 Tecumseh Court, Woodbridge, VA 22192

Title Insurance: First American Title Insurance Company







MIN: ▊▊▊▊▊▊▊▊▊▊   Loan Number: ▊▊▊▊▊▊▊

# ADJUSTABLE RATE RIDER
## (LIBOR Six-Month Index (As Published In *The Wall Street Journal*)
## - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 12th day of MARCH, 2007 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Adjustable Rate Note (the "Note") to JUST MORTGAGE, INC., A
CALIFORNIA CORPORATION
("Lender") of the same date and covering the property described in the Security Instrument and located at:

3075 TECUMSEH COURT, WOODBRIDGE, VIRGINIA 22192

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND
THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of      6.875 %. The Note provides for changes
in the interest rate and the monthly payments, as follows:

## 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A)  Change Dates
The interest rate I will pay may change on the 1st   day of APRIL, 2012 ,
and on that day every 6th   month thereafter. Each date on which my interest rate could change is called
a "Change Date."
### (B)  The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the
average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market
("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first
business day of the month immediately preceding the month in which the Change Date occurs is called the
"Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information. The Note Holder will give me notice of this choice.

17

**(C)  Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 250/1000 percentage points ( 3.250 %) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.

**(D)  Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.875 % or less than 3.250 %.  Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 000/1000 percentage points ( 1.000 %) from the rate of interest I have been paying for the preceding 6 months.  My interest rate will never be greater than 11.875 %.

**(E)  Effective Date of Changes**

My new interest rate will become effective on each Change Date.  I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan

---

MULTISTATE ADJUSTABLE RATE RIDER--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
Single Family--Fannie Mae MODIFIED INSTRUMENT
Form 3138 1/01                              Page 2 of 3

DocMagic *eFerms* 800-649-1362
*www.docmagic.com*



assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Suhag Dave._ (Seal)
SUHAGI DAVE                    -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

MULTISTATE ADJUSTABLE RATE RIDER--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
Single Family--Fannie Mae MODIFIED INSTRUMENT
Form 3138 1/01                    Page 3 of 3

*DocMagic* 800-649-1362
*www.docmagic.com*

19



Loan Number:

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 12th day of MARCH, 2007 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to JUST MORTGAGE, INC., A CALIFORNIA
CORPORATION
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

3075 TECUMSEH COURT, WOODBRIDGE, VIRGINIA 22192
[Property Address]

1-4 FAMILY COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY
INSTRUMENT.** In addition to the Property described in Security Instrument, the following
items now or hereafter attached to the Property to the extent they are fixtures are added to the
Property description, and shall also constitute the Property covered by the Security Instrument:
building materials, appliances and goods of every nature whatsoever now or hereafter located
in, on, or used, or intended to be used in connection with the Property, including, but not
limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas,
water, air and light, fire prevention and extinguishing apparatus, security and access control
apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves,
refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors,
screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and
attached floor coverings, all of which, including replacements and additions thereto, shall be
deemed to be and remain a part of the Property covered by the Security Instrument. All of the
foregoing together with the Property described in the Security Instrument (or the leasehold
estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and
the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek,
agree to or make a change in the use of the Property or its zoning classification, unless Lender
has agreed in writing to the change. Borrower shall comply with all laws, ordinances,
regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not
allow any lien inferior to the Security Instrument to be perfected against the Property without
Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss
in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default

---

MULTISTATE 1-4 FAMILY RIDER
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3170 1/01                     Page 2 of 3

DocMagic *EFormS* 800-649-1362
*www.docmagic.com*



or invalidate any other right or remedy of Lender.  This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I.  CROSS-DEFAULT PROVISION.**  Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_Suhagi Dave_ (Seal)          _____ (Seal)
SUHAGI DAVE          -Borrower                                    -Borrower


_____ (Seal)          _____ (Seal)
                     -Borrower                                    -Borrower


_____ (Seal)          _____ (Seal)
                     -Borrower                                    -Borrower

Loan Number:

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this      12th          day of
MARCH, 2007                      , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date,
given by the undersigned (the "Borrower") to secure Borrower's Note to  JUST MORTGAGE,
INC., A CALIFORNIA CORPORATION
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

3075 TECUMSEH COURT, WOODBRIDGE, VIRGINIA 22192
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other
such parcels and certain common areas and facilities, as described in
COVENANTS, CONDITIONS AND RESTRICTIONS OF RECORD

(the "Declaration"). The Property is a part of a planned unit development known as

LAKE RIDGE
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent
entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the
uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument,
Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation,
trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or
other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and
assessments imposed pursuant to the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally accepted
insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and
which provides insurance coverage in the amounts (including deductible levels), for the periods, and against
loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but
not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the
provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property
insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance
coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the
Owners Association policy.

---

MULTISTATE PUD RIDER--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01                        Page 1 of 3                        DocMagic *eForms* 800-649-1362
www.docmagic.com

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_Suhagi Dave._ (Seal)
SUHAGI DAVE              -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

Assessor's/Tax ID No ███████
Recording Requested By:
PHH MORTGAGE CORPORATION

When Recorded Return To:

LIEN RELEASE
PHH MORTGAGE CORPORATION
1795 INTERNATIONAL WAY
IDAHO FALLS, ID 83402

**201910230078070**

**Prince William County, VA
10/23/2019 12:26 PM  Pages: 1
Jacqueline C Smith, Esq., Clerk**

Prepared By:  June Reyes,  PHH MORTGAGE CORPORATION 1795 INTERNATIONAL WAY, IDAHO FALLS, ID 83402
800-746-2936

CORPORATE ASSIGNMENT OF DEED OF TRUST

Prince William, Virginia
SELLER'S SERVICING #:7190153689 "DAVE"
SEL███████
MIN███████

Date of Assignment: 09/04/2019
Assignor: Mortgage Electronic Registration Systems, Inc., as beneficiary, as nominee for Just Mortgage, Inc., its
successors and assigns at  PO BOX 2026, FLINT, MI  48501
Assignee: DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR INDYMAC IMSC MORTGAGE
LOAN TRUST 2007-AR1, MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2007-AR1 at C/O PHH
MORTGAGE CORPORATION at 5720 PREMIER PARK DRIVE, WEST PALM BEACH, FL 33407

Executed By: Suhagi DAVE  To: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR
JUST MORTGAGE INC., ITS SUCCESSORS AND ASSIGNS
 Trustee: EDGARD MARTINEZ Date of Deed of Trust:  03/12/2007 Recorded:  03/15/2007  as Instrument No.:
200703150032076  In Prince William County, State of Virginia.

Property Address: 3075 TECUMSEH COURT, WOODBRIDGE, VA. 22192

   KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of
which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Deed of
Trust having an original principal sum of $204,500.00 with interest, secured thereby, and the full benefit of all the
powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys
unto the said Assignee, the Assignor's interest under the Deed of Trust.

   TO HAVE AND TO HOLD the said Deed of Trust, and the said property unto the said Assignee forever, subject
to the terms contained in said Deed of Trust. IN WITNESS WHEREOF, the assignor has executed these presents
the day and year first above written:
  Mortgage Electronic Registration Systems, Inc., as beneficiary, as nominee for Just Mortgage, Inc., its successors
and assigns
On 09/04/2019

By:
Beverly J Clayton
Assistant Secretary


STATE OF FLORIDA
COUNTY OF PALM BEACH

On 09/04/2019, before me, _____Christian J. Ferrer_____, a Notary Public in and for PALM BEACH in the State
of FLORIDA, personally appeared Beverly J Clayton, Assistant Secretary being duly sworn of MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS, INC., AS BENEFICIARY, AS NOMINEE FOR JUST MORTGAGE,
INC., ITS SUCCESSORS AND ASSIGNS, personally known to me (or proved to me on the basis of satisfactory
evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by
his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal,


_____Christian J. Ferrer_____
Notary Expires: 12/30/2020

Notary Public State of Florida
Christian J Ferrer
My Commission GG 035572
Expires 12/30/2020

(This area for notarial seal)

MIN: ▓▓▓▓▓▓▓▓                              Loan Number: ▓▓▓▓▓▓▓▓

# ADJUSTABLE RATE NOTE
### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*)-Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

MARCH 12, 2007                     ROCKVILLE            MARYLAND
[Date]                              [City]               [State]

3075 TECUMSEH COURT, WOODBRIDGE, VIRGINIA 22192
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 204,500.00          (this amount is called "Principal"), plus interest, to the order of Lender. Lender is JUST MORTGAGE, INC., A CALIFORNIA CORPORATION                                                                     .
I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of     6.875 %. The interest rate I will pay may change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS
(A)  Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payments on the 1st   day of each month beginning on MAY 1 2007  . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on APRIL 1, 2037          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at  708 CORPORATE CENTER DRIVE, POMONA, CALIFORNIA 91768
                                    or at a different place if required by the Note Holder.
(B)  Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ 1,343.42        . This amount may change.** See attached Interest Only Note Addendum.
(C)  Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

---

MULTISTATE ADJUSTABLE RATE NOTE--LIBOR SIX-MONTH INDEX                          Form 3520 1/01
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)--Single Family                *DocMagic* *eFerms* 800-649-1362
Fannie Mae MODIFIED INSTRUMENT                                            *www.docmagic.com*
For Use in VIRGINIA Only                     Page 1 of 5

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the 1st day of APRIL, 2012 , and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 250/1000 percentage points ( 3.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.875 % or less than 3.250 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 000/1000 percentage point(s) ( 1.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 11.875 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

MULTISTATE ADJUSTABLE RATE NOTE--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)--Single Family
Fannie Mae MODIFIED INSTRUMENT
For Use in VIRGINIA Only                                   Page 2 of 5

Form 3520 1/01
*DocMagic* 800-649-1362
*www.docmagic.com*

## 6.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me.  If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.  BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)  Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   15 calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be       5.000 % of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

### (B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount.  That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

## 8.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor and waive the benefit of the homestead exemption as to the Property described in the Security Instrument (as defined below).  "Presentment" means the right to require the Note Holder to demand payment of amounts due.

MULTISTATE ADJUSTABLE RATE NOTE--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)--Single Family
Fannie Mae MODIFIED INSTRUMENT
For Use in VIRGINIA Only                                                      Page 3 of 5

Form 3520 1/01
*DocMagic eForms* 800-649-1362
*www.docmagic.com*

"Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.  Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE NOTE--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)--Single Family
Fannie Mae MODIFIED INSTRUMENT
For Use in VIRGINIA Only                                    Page 4 of 5

Form 3520 1/01
*DocMagic eForms* 800-649-1362
*www.docmagic.com*

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Suhagi Dave_ _____ (Seal)           _____ (Seal)
SUHAGI DAVE                    -Borrower                                        -Borrower


_____ (Seal)         _____ (Seal)
                              -Borrower                                        -Borrower


_____ (Seal)         _____ (Seal)
                              -Borrower                                        -Borrower


*[Sign Original Only]*


This is to certify that this is the Note described in and secured by a Deed of Trust dated  MARCH 12          ,
2007                    , on the Property located in  PRINCE WILLIAM                      , Virginia.


My Commission Expires:                          PHILIP H. NEFF
                                        NOTARY PUBLIC STATE OF MARYLAND
                                           COUNTY OF MONTGOMERY
                                        My Commission Expires March 1, 2010

_____
                 Notary Public

MULTISTATE ADJUSTABLE RATE NOTE--LIBOR SIX-MONTH INDEX                    Form 3520 1/01
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)--Single Family      DocMagic *eForms* 800-649-1362
Fannie Mae MODIFIED INSTRUMENT                                        *www.docmagic.com*
For Use in VIRGINIA Only                        Page 5 of 5

MIN: ███████████████        Loan Number: ████████████

# INTEREST-ONLY ADDENDUM
## ADDENDUM TO ADJUSTABLE RATE NOTE

This interest-only addendum is made MARCH 12, 2007 and incorporated into and deemed to amend and supplement the Adjustable Rate Note (the "Note") and the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the Note to JUST MORTGAGE, INC., A CALIFORNIA CORPORATION
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
3075 TECUMSEH COURT, WOODBRIDGE, VIRGINIA 22192

**THIS ADDENDUM SUPERSEDES** Section 3(A) and (B) of the Note.  All other terms and conditions of the above referenced Note remain in full force and effect.

## 3.  PAYMENTS

(A)  **Time and Place of Payments.**

I will pay interest by making payments every month for the first  120  payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues.  I will pay principal and interest by making payments every month thereafter for the next  240  in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note in equal monthly payments.

I will make my monthly payments on the  1st  day of each month beginning MAY 1 , 2007 .  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal.  If, on APRIL 1, 2037 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my payments at 708 CORPORATE CENTER DRIVE, POMONA, CALIFORNIA 91768
, or at a different place if required by the Note Holder.

(B)  **Amount of My Initial Monthly Payments.**

Each of my initial Interest-Only monthly payments will be in the amount of U.S. $ 1,171.61 .
This amount is based on the original principal balance of the Note.  If I make payments to principal during the interest-only period, the remaining interest payments will be based on the remaining principal balance.

_Suhagi Dave_ (Seal)
SUHAGI DAVE                 -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

# ALLONGE TO NOTE

**LOAN #:** ████████

**PROPERTY ADDRESS:** 3075 TECUMSEH COURT
WOODBRIDGE, VIRGINIA 22192

**PRINCIPAL BALANCE:** $204,500.00

**ALLONGE TO NOTE DATED:** MARCH 12, 2007

**IN FAVOR OF** JUST MORTGAGE, INC., A CALIFORNIA CORPORATION

**AND EXECUTED BY**
SUHAGI DAVE

**PAY TO THE ORDER OF**

   IndyMac Bank, F.S.B.

**WITHOUT RECOURSE**
JUST MORTGAGE, INC., A CALIFORNIA CORPORATION

BY: _____
      MINH LAM

TITLE: ASSISTANT V.P.

Pay To The Order Of

Without Recourse
IndyMac Bank, F.S.B.

By: _____
   Brien Brouillard
   First Vice President

DocMagic *eForms* 800-649-1362
www.docmagic.com

Atn.lsr-a

*Ocwen Loan Servicing, LLC*
*P.O. Box 24737*
*West Palm Beach, Florida 33416-4737*
*(Do not send correspondence or payments to the above address.)*

OCWEN

WWW.OCWEN.COM

## Helping Homeowners Is What We Do! ™

Monday, October 19, 2015

Suhagi Dave
3075 Tecumseh Ct
Woodbridge, VA 22192

**Your executed Home Affordable Modification Agreement!**

Re:     Loan Numbe█████████
        Property Address:  3075 Tecumseh Ct | Woodbridge, VA 22192

Dear Borrower(s):

We are glad to be able to assist all qualifying homeowners save their homes from foreclosure and thank you for sending in your completed Home Affordable Modification Agreement.

Included with this letter is an executed copy of your Home Affordable Modification Agreement to keep for your records.

If you have any questions regarding your Home Affordable Modification Agreement, please call our Customer Care Center at (800) 746-2936 Monday to Friday 8:00 am to 9:00 pm, Saturday 8:00 am to 5:00 pm and Sunday 12:00 pm to 9:00 pm ET, and remember **"Helping Homeowners is what we do!"**

Sincerely,

Ocwen Loan Servicing, LLC

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect a debt.   NMLS# 1852*

Investor Loan # _____

**After Recording Return To:**

_____
_____
_____
_____

This document was prepared by _____
_____[Space Above This Line For Recording Data]_____

## HOME AFFORDABLE MODIFICATION AGREEMENT

## (Step Two of Two-Step Documentation Process)

Borrower(s) ("I"): **Suhagi Dave**

Servicer ("Servicer"): *Ocwen Loan Servicing, LLC*

Date of first lien Security Instrument ("Mortgage") and Note ("Note"): **3/12/2007**

Loan Number: ▮▮▮▮▮▮

Property Address: **3075 Tecumseh Ct Woodbridge, VA 22192** ("Property")

If my representations in Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Servicer, the Servicer will send me a signed copy of this Agreement. This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1.  **My Representations.** I certify, represent to Servicer and agree:

    A.  I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

    B.  I live in the Property as my principal residence, and the Property has not been condemned;

    C.  There has been no change in the ownership of the Property since I signed the Loan Documents;

    D.  I have provided documentation for all income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification program ("Program"));

    E.  Under penalty of perjury, all documents and information I have provided to Servicer in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

    F.  If Servicer requires me to obtain credit counseling in connection with the Program, I will do so;

    G.  I have made or will make all payments required under a Trial Period Plan or Loan Workout Plan; and

BALL_Tier2_v2.0
383903
*NMLS # 1852*

2. **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:

   A.    TIME IS OF THE ESSENCE under this Agreement;

   B.    If prior to the Modification Effective Date as set forth in Section 3 the Servicer determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Agreement will terminate. In this event, the Servicer will have all of the rights and remedies provided by the Loan Documents; and

   C.    I understand that the Loan Documents will not be modified unless and until (i) I receive from the Servicer a copy of this Agreement signed by the Servicer, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Servicer will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3. **The Modification.** If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on 11/1/2015 (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. The Loan Documents will be modified and the first modified payment will be due on 11/1/2015.

   A.    The new Maturity Date will be: 5/1/2037, at which time a final balloon payment in an amount equal to all remaining amounts owed under the Loan Documents will be due.

   B.    The modified Principal balance of my Note will include all amounts and arrearages that will be past due (excluding unpaid late charges) less any amounts paid to the Servicer but not previously credited to my Loan. The new Principal balance of my Note will be  $192,000.53 (the "New Principal Balance").

   C.    Interest at the rate of 3.62500% will begin to accrue on the New Principal Balance as of 10/1/2015 and the first new monthly payment on the New Principal Balance will be due on 11/1/2015. My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1-Loans Maturity | 3.62500% | 10/1/2015 | $758.25 | $114.75, adjusts annually after year 1 | $873.00, adjusts annually after year 1 | 11/1/2015 | 259 |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |

   *The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

   The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step or simple interest rate.

   D.    I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

   E.    If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

   F.    I agree to pay in full (1) the Deferred Principal Balance (deferred principal balance will be treated as a non-interest bearing principal forbearance. I will not pay interest or make monthly payments on the deferred principal balance.), if any, and (2) any other amounts still owed under the Loan Documents, by the earliest of: (i) the date I sell or transfer an interest in the Property, (ii) the date I pay the entire Interest Bearing Principal Balance (The new principal balance less the deferred principal balance shall be referred to as the "interest bearing principal balance"), or (iii) the new Maturity Date.

BALL_Tier2_v2.0
383903
*NMLS # 1852*

-BALL-

4. **Additional Agreements**. I agree to the following:

A. That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless a borrower or co-borrower is deceased or the Servicer has waived this requirement in writing.

B. That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or Workout Plan that I previously entered into with Servicer.

C. To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D. Funds for Escrow Items. I will pay to Servicer on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Servicer under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Servicer in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Servicer requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Servicer all notices of amounts to be paid under this Section 4.D. I shall pay Servicer the Funds for Escrow Items unless Servicer waives my obligation to pay the Funds for any or all Escrow Items.

Servicer may waive my obligation to pay to Servicer Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Servicer and, if Servicer requires, shall furnish to Servicer receipts evidencing such payment within such time period as Servicer may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Servicer may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Servicer any such amount. Servicer may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Servicer all Funds, and in such amounts, that are then required under this Section 4.D.

Servicer may, at any time, collect and hold Funds in an amount (a) sufficient to permit Servicer to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a Servicer can require under RESPA. Servicer shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Servicer, if Servicer is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Servicer shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Servicer shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Servicer pays me interest on the Funds and applicable law permits Servicer to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Servicer shall not be required to pay me any interest or earnings on the Funds. Servicer and I can agree in writing, however, that interest shall be paid on the Funds. Servicer shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Servicer shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Servicer shall notify me as required by RESPA, and I shall pay to Servicer the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Servicer shall notify me as required by RESPA, and I shall pay to Servicer the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Servicer shall promptly refund to me any Funds held by Servicer.

BALL_Tier2_v2.0
383903
*NMLS # 1852*

E.   That this Agreement constitutes notice that the Servicer's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fully fund my Escrow Account.

F.   That the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

G.   That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Servicer and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

H.   That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows:  If all or any part of the Property or any interest in it is sold or transferred without Servicer's prior written consent, Servicer may, at its option, require immediate payment in full of all sums secured by the Mortgage.  However, Servicer shall not exercise this option if federal law prohibits the exercise of such option as of the date of such sale or transfer.  If Servicer exercises this option, Servicer shall give me notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage.  If I fail to pay these sums prior to the expiration of this period, Servicer may invoke any remedies permitted by the Mortgage without further notice or demand on me.

I.   That, as of the Modification Effective Date, I understand that the Servicer will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3.  A buyer or transferee of the Property will not be permitted, under any circumstance, to assume the Loan.  Except as noted herein, this Agreement may not, under any circumstances, be assigned to, or assumed by, a buyer of the Property.

J.   If under the Servicer's procedures a title endorsement or subordination agreements are required to ensure that the modified mortgage Loan retains its first lien position and is fully enforceable, I understand and agree that the Servicer will not be obligated or bound to make any modification of the Loan Documents or to execute the Modification Agreement if the Servicer has not received an acceptable title endorsement and/or subordination agreements from other lien holders, as Servicer determines necessary.

K.   That, as of the Modification Effective Date, any provision in the Note, as amended, for the assessment of a penalty for full or partial prepayment of the Note is null and void.

L.   Corrections and Omissions.  You agree to execute such other and further documents as may be reasonably necessary to consummate the transactions contemplated herein or to perfect the liens and security interests intended to secure the payment of the loan evidenced by the Note. If an error in the terms hereof is detected after execution of this Agreement, you understand that a corrected Agreement will be provided to you and this Agreement will be void upon notice of such error.  Should you elect not to sign any such corrected Agreement, your loan will revert to the terms of your original Loan Documents.

M.   Mortgage Electronic Registration Systems, Inc. "MERS" is a separate corporation existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026 Flint, MI 48501-2026, (888) 679-MERS.  In cases where the Loan has been registered (solely as nominee for lender and lender's successors and assigns) with MERS and MERS is named as mortgagee in the Loan Documents, MERS, if necessary to comply with law or custom, has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Servicer including, but not limited to, releasing and canceling the mortgage loan.

N.   That if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents."  I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

BALL_Tier2_v2.0
383903
NMLS # 1852

☐ *If this box is checked, Borrower(s) signature must be notarized.*

, In Witness Whereof, the Servicer and I have executed this Agreement.

Sign Here→ *Suhagi Dave* ___ 10 / 5 / 2015 ___ Date
                     Suhagi Dave

State of Virginia)

County of _PRINCEWILLIAM_ )

On _____ before me, _____ personally     appeared
_____, who proved to me on the basis of satisfactory evidence to be
the person(s) whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her
authorized capacity, and that by his/her signature(s) on the instrument the person, or the entity upon behalf of which the person
acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Virginia that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____ (Seal)

Print Name: _____

Commission expiration date____/____/_____

Personally Known_____ OR Produced Identification_____

Type of Identification Produced_____

---

Sign Here→ *Suhagi Dave* ___ 10 / 05 / 2015 ___ Date

State of Virginia)

County of _____ )

On _____ before me, _____ personally     appeared
_____, who proved to me on the basis of satisfactory evidence to be
the person(s) whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her
authorized capacity, and that by his/her signature(s) on the instrument the person, or the entity upon behalf of which the person
acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Virginia that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____ (Seal)

Print Name: _____

Commission expiration date____/____/_____

Personally Known_____ OR Produced Identification_____

Type of Identification Produced_____

*BALL_Tier2_v2.0*
383903
*NMLS # 1852*

**\*All individuals on the title (even if not a borrower on the note) must sign this agreement. If there are more than two title holders to this property, please have them sign below. If no other title holders exist, please leave page 6 blank and return it with the rest of the agreement.**

In Witness Whereof, the Servicer and I have executed this Agreement.

Sign Here→    _____    _____/_____/_____    Date

State of <u>Virginia</u>)

County of _____)

On _____ before me, _____personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature(s) on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Virginia that the foregoing paragraph is true and correct. WITNESS my hand and official seal.

Signature _____ (Seal)

Print Name: _____

Commission expiration date_____/_____/_____

Personally Known_____ OR Produced Identification_____

Type of Identification Produced_____

---

Sign Here→    _____    _____/_____/_____    Date

State of <u>Virginia</u>)

County of _____)

On _____ before me, _____personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature(s) on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Virginia that the foregoing paragraph is true and correct. WITNESS my hand and official seal.

Signature _____ (Seal)

Print Name: _____

Commission expiration date_____/_____/_____

Personally Known_____ OR Produced Identification_____

Type of Identification Produced_____

---

Servicer _____    BY _____

OCT 1 6 2015                        April Alston
                                    **Authorized Officer**
Date
If applicable: _____

Mortgage Electronic Registration Systems, Inc. – Nominee for Servicer

BALL_Tier2_v2.0
383903
*NMLS # 1852*

## BALLOON PAYMENT DISCLOSURE

Borrower(s) ("I"): Suhagi Dave

Servicer ("Servicer"): *Ocwen Loan Servicing, LLC*

Date of first lien Security Instrument ("Mortgage") and Note ("Note"): 3/12/2007

Loan Number: ███████

Property Address: 3075 Tecumseh Ct Woodbridge, VA 22192

THIS BALLOON PAYMENT DISCLOSURE is made this 11 day of September, 2015, and is incorporated into and shall be deemed to supplement the Loan Modification Agreement (the "Agreement") of the same date given by the undersigned Borrower(s). The Agreement contains a balloon payment provision representing the amount of the Deferred Principal Balance under the Agreement.

A balloon payment is a scheduled lump sum usually due at the end of the mortgage loan term that is significantly larger than the other regularly scheduled periodic payments. This means that even if I make all payments full and on time, the loan will not be paid in full by the final payment date. The amount of the balloon payment may vary depending on my payment history. If my loan is an adjustable rate mortgage, the amount of the balloon payment also may vary based on any interest rate changes that occur during the life of the loan.

THIS CONTRACT IS NOT PAYABLE IN INSTALLMENTS OF EQUAL AMOUNTS: AN INSTALLMENT OF $122,127.57 WILL BE DUE AND PAYABLE IN FULL ON 5/1/2037, PROVIDED THAT ALL PAYMENTS ARE MADE IN ACCORDANCE WITH THE LOAN TERMS AND THE INTEREST RATE DOES NOT CHANGE FOR THE ENTIRE LOAN TERM. The balloon payment on the loan modification I have applied for is due 259 months from the effective date of the modification.

*Notice required by North Dakota law:*

CAUTION TO BORROWER: IF YOU DO NOT HAVE THE FUNDS TO PAY THE BALLOON PAYMENT WHEN DUE, IT MAY BE NECESSARY FOR YOU TO OBTAIN A NEW LOAN AGAINST YOUR PROPERTY FOR THIS PURPOSE AND YOU MAY BE REQUIRED TO AGAIN PAY COMMISSION AND EXPENSES FOR ARRANGING THE LOAN. KEEP THIS IN MIND IN DECIDING UPON THE AMOUNT AND TERMS OF THE LOAN MODIFICATION THAT YOU OBTAIN AT THIS TIME.

If I cannot pay the balloon payment when due, I may have to obtain a new loan to make the balloon payment or I may lose my property through foreclosure. Before deciding to take this loan, I will consider my ability to pay the balloon payment when it comes due. In addition, the value of the real estate securing this loan may change during the term of the loan. On the date the balloon payment becomes due, the value of the real estate may not be sufficient to secure a new loan in an amount equal to the balloon payment.

NEITHER OCWEN LOAN SERVICING, LLC NOR ANY LENDER TO WHICH THIS LOAN IS TRANSFERRED IS UNDER ANY OBLIGATION TO FINANCE THE AMOUNT OF THE BALLOON PAYMENT. THEREFORE, I MAY BE REQUIRED TO REPAY THE LOAN OUT OF ASSETS I OWN OR I MAY HAVE TO FIND ANOTHER LENDER TO REFINANCE THE LOAN.

BALL_Tier2_v2.0
383903
*NMLS # 1852*

ASSUMING THE OWNER OF MY LOAN OR ANOTHER LENDER REFINANCES THIS LOAN AT MATURITY, I WILL PROBABLY BE CHARGED INTEREST AT MARKET RATES PREVAILING AT THAT TIME AND SUCH RATES MAY BE HIGHER THAN THE INTEREST RATE PAID ON THIS LOAN.  I MAY ALSO HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW MORTGAGE LOAN.

I/we have read the above disclosure and acknowledge receiving a copy by signing below.

**\*All individuals on the title (even if not a borrower on the note) must sign this agreement. If there are more than two title holders to this property, please have them sign below.**

_____  ◁ [SIGN]          _____
Borrower                                                                   Date   00-05-2015

_____  ◁ [SIGN]          _____
Borrower                                                                   Date   10/5/2015

Page 8 of 8

*BALL_Tier2_v2.0*
383903
*NMLS # 1852*

3075 TECUMSEH CT

General Info | Notes | Map

## Property Information

| Account Number | 061174 | Property Address: |
|---|---|---|
| Owner Name | DAVE SUHAGI & VASHISHTHA DAVE SURV | 3075 TECUMSEH CT |
| Owner Address | 3075 TECUMSEH CT | WOODBRIDGE VA 22192 |
| | WOODBRIDGE VA 22192 | |

| Description |
|---|
| LAKE RIDGE SEC 11-E LOT 61-A |

| Assessment Info | | 2019 Assessment | |
|---|---|---|---|
| Neighborhood | 01063 Lk Ridge - Mohican North TH | Land - Market Value | $85,300 |
| Fire House | 11 - OWL | Land - Use Value | $0 |
| Special District | | Impr - Market Value | $200,600 |
| Zoning | Res. Planned Community | Total - Market Value | $285,900 |
| Acres | 0.0367 | | |

<< Previous Card | Card 1 of 1 | Next Card >>

### Dwelling Information

| # of Stories | 2 | # Bedrooms | 3 | Card Level Use Code | 031 - Townhouse Owner Dvlpmnt |
|---|---|---|---|---|---|
| Year Built | 1979 | Full Baths | 2 | Basement Type | 234 Walkout |
| Fin Area | 1512 | Half Baths | 2 | Style | 10 Townhouse Interior Unit |
| Unfin Area | 0 | Basement Area | 756 | Exterior Wall | 86 TH-IU Brick Front w/AV |
| Fireplaces | 1 | Fin Basement | 576 | Parcel Level Use Code | 031 - Townhouse |

Card - 1

### Improvements

| IMPR Type | Description | Area |
|---|---|---|
| Addition | PAT Patio | 180 |
| Other Improvement | SS1 Storage Shed | 48 |

### Assessment History

| Reason | Year | Land | Use | IMPR | Total |
|---|---|---|---|---|---|
| General Reassessment | 2019 | $85,300 | $0 | $200,600 | $285,900 |
| General Reassessment | 2018 | $82,000 | $0 | $189,700 | $271,700 |
| General Reassessment | 2017 | $80,200 | $0 | $179,100 | $259,300 |
| General Reassessment | 2016 | $75,400 | $0 | $170,600 | $246,000 |
| General Reassessment | 2015 | $75,200 | $0 | $165,400 | $240,600 |
| General Reassessment | 2014 | $75,200 | $0 | $166,300 | $241,500 |
| General Reassessment | 2013 | $70,800 | $0 | $160,400 | $231,200 |
| General Reassessment | 2012 | $67,400 | $0 | $152,200 | $219,600 |
| General Reassessment | 2011 | $73,200 | $0 | $148,800 | $222,000 |
| General Reassessment | 2010 | $51,500 | $0 | $116,100 | $167,600 |
| General Reassessment | 2009 | $51,500 | $0 | $117,100 | $168,600 |
| General Reassessment | 2008 | $87,300 | $0 | $195,400 | $282,700 |
| General Reassessment | 2007 | $97,000 | $0 | $205,300 | $302,300 |
| General Reassessment | 2006 | $90,600 | $0 | $229,800 | $320,400 |
| General Reassessment | 2005 | $61,700 | $0 | $170,500 | $232,200 |
| General Reassessment | 2004 | $43,700 | $0 | $145,100 | $188,800 |
| General Reassessment | 2003 | $36,000 | $0 | $126,200 | $162,200 |
| General Reassessment | 2002 | $36,000 | $0 | $99,500 | $135,500 |
| General Reassessment | 2001 | $31,300 | $0 | $90,400 | $121,700 |
| General Reassessment | 2000 | $30,400 | $0 | $79,900 | $110,300 |
| General Reassessment | 1999 | $30,400 | $0 | $75,400 | $105,800 |
| General Reassessment | 1998 | $29,400 | $0 | $73,600 | $103,000 |
| General Reassessment | 1997 | $29,400 | $0 | $73,700 | $103,100 |
| General Reassessment | 1996 | $28,100 | $0 | $70,600 | $98,700 |

### Transfer History

| Date | Sale Amount | Owner | Transfer Type | Conveyance Number |
|---|---|---|---|---|
| 2013/07/26 | $0 | DAVE SUHAGI & VASHISHTHA DAVE SURV | XF | 201307260076326 |
| 2000/09/13 | $125,000 | DAVE SUHAGI | XB | 2948-1388 |
| 1998/11/16 | $101,060 | HOUSEHOLD BANK FSB | XC | 2656-0340 |
| 1988/04/01 | $120,000 | LEWIS GARY D & PARRIS SEAFORTH | | 1560-0590 |
| 1987/10/01 | $103,000 | MADDOX DAVID & DEBORAH SURV | | 1520-1026 |
| 1985/11/01 | $0 | BENHAM JAMES E & PHYLLIS S SURV | | 1346-0597 |
| 1983/09/01 | $0 | HAHULA ROBIN L | | 1231-1195 |